(312 P.3d 373)
No. 105,993

MANUAL and LOIS BARABAN, *Appellants*, v. GLENN and VANILDA HAMMONDS, Trustees of the Hammonds Family Living Trust, and BENJAMIN and LINDA PICCIRILLO, *Appellees*.

Opinion filed October 18, 2013.

*Constance L. Shidler*, of Smithyman & Zakoura, Chartered, of Overland Park, for appellants.

*Carrie E. Josserand*, of Lathrop & Gage LLP, of Overland Park, for appellees Benjamin and Linda Piccirillo.

Before McANANY, P.J., HILL and LEBEN, JJ.

LEBEN, J.: This case arises out of the sale of real estate in Johnson County—parcels of land originally owned by Glenn and Vanilda Hammonds through some family trusts. The Hammondses had a house that sat mostly on one lot but overlapped a few feet over the lot line of another parcel, Lot 52. The Hammondses sold Lot 52 to Benjamin and Linda Piccirillo, who built a house on Lot 52. The Piccirillos then sold Lot 52 to Manual and Lois Baraban.

Disputes arose once the Barabans discovered that the Hammondses' house at the border of Lot 52 actually sat partially on that lot; the Barabans demanded removal of the house, and eventually the Barabans sued the Hammondses and the Piccirillos. Our appeal generally resolves two overriding issues.

First, the district court enforced an alleged settlement agreement between the Barabans and the Piccirillos, ending the Piccirillos' involvement in the suit—an order that came only after the court heard testimony from a mediator about what the parties had agreed to in mediation. But K.S.A. 2012 Supp. 60-452a gives all parties involved in mediation a privilege to prevent anyone from disclosing "any communication" made during mediation, and the Barabans objected to the mediator's testimony at the hearing. The district court should not have allowed that testimony, and without it there's no evidence upon which the alleged settlement can be enforced. We therefore reverse the district court's order enforcing the settlement.

Second, the district court ruled after a contested trial that the Barabans' deed to Lot 52 should be reformed, or modified, to show that the portion on which the Hammondses' house sits belongs to the neighboring lot. This was based on an agreement between the Hammondses and the Piccirillos about the lot's border and upon the Barabans' ability to have detected that the house overlapped the boundary line. There is sufficient evidence to support the district court's ruling on both points, and we therefore affirm its judgment as between the Barabans and the Hammondses.

Before going into further detail about the issues in this appeal, we will first set out the factual and procedural background of the case. We will then discuss the issues raised by the parties on appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

In January 2003, Glenn and Vanilda Hammonds, as trustees of the Hammonds Family Living Trust, bought several lots in Spring Hill. One of the lots was Lot 52, and there was an existing house located on the lot immediately to the north.

Our lawsuit generally concerns questions that have arisen because that house actually extends a few feet onto Lot 52, and the lot was later sold. The primary factual question is whether the sale of Lot 52 was intended to include the portion already occupied by the house.

In June 2003, Glenn Hammonds entered into a contract to sell Lot 52 to Benjamin Piccirillo, a builder. They intended to exclude the portion of land containing the house from the sale and to create a larger easement across the north end of Lot 52 to provide a buffer between the existing house and any new structures that might be placed on Lot 52. To that end, Benjamin Piccirillo and Glenn Hammonds signed an agreement on July 30, 2003, for an "Easement for Dwelling Placement for 20715 Lone Elm Road," which is Lot 52. But neither Hammonds nor Piccirillo filed the agreement for an easement with the local register of deeds.

The next day, the Hammondses completed the sale of Lot 52 to Benjamin and Linda Piccirillo. The warranty deed, which was recorded with the register of deeds, didn't reflect that the portion of land containing the existing house was excluded from the sale of Lot 52, and the deed didn't mention an easement. The Hammondses retained the neighboring land and rented the existing house for $900 a month.

Benjamin Piccirillo then proceeded to build a house on Lot 52. He obtained a zoning variance to install a septic system, obtained a building permit, and built the house.

In May 2005, the Piccirillos sold the property to Manual and Lois Baraban. The warranty deed indicated that all of Lot 52 (with a legal description including the area on which the Hammondses' house partially sits) was sold. The deed didn't mention either the Hammondses' house or an easement. Manual Baraban testified that, before he bought the property, he searched the public record

and didn't find a recorded easement for the house or a reference to any encroachment onto Lot 52.

But the Barabans eventually discovered that the Hammondses' house stretched over the Lot 52 property line. In March 2006, the Barabans sent a letter to Glenn Hammonds alleging that the Hammondses' house was on the Barabans' property and threatening legal action if the house wasn't removed. In June 2007, the Barabans filed suit for quiet title, or establishment of ownership, against the Piccirillos and the Hammondses, asking for a court determination that the Barabans own the entirety of Lot 52—including the portion on which the Hammondses' house sits. Later, the Barabans filed an amended petition that included claims for ejectment, trespass, fraud, and nuisance related to the sale of the lot and to property alterations the Hammondses had made around their house.

In February 2008, Manual Baraban and the Piccirillos attended mediation, although Manual's wife, Lois, didn't attend. The mediation session was facilitated by a retired district judge. No written or signed settlement agreement was adopted at the mediation, but the next day, the mediator emailed terms of an agreement—thought by the mediator to have been orally agreed upon at the mediation—to attorneys for both parties.

The Piccirillos filed a motion to enforce the settlement agreement as described in the mediator's email. At a hearing on the motion, the mediator testified that the parties had reached an agreement at the mediation, with the terms as set out in his email. Lois Baraban submitted an affidavit stating that she had never authorized the settlement.

In August 2008, the district court granted the Piccirillos' motion to enforce the settlement. The district court found that the Barabans had agreed to dismiss their lawsuit against the Piccirillos for several installment payments totaling $8,000. Based on this settlement, the Piccirillos were dismissed from the lawsuit.

The suit continued between the Barabans and the Hammondses. In 2009, the district court denied the Barabans' motion for partial summary judgment—a judgment on a matter of law where there are no facts in dispute—finding that there were genuine issues of material fact about whether the Barabans knew or should have

known of the house encroachment onto Lot 52 before they bought the property. The case proceeded to trial in January 2011.

Some of the issues in the case were tried by a jury, while the judge decided claims related to who was the rightful owner of the portion of original Lot 52 where the house overlaps the original property boundary. Generally, legal claims—such as a claim for damages for trespassing—are presented to a jury, while equitable claims—such as who has proper title to real estate—are presented to a judge. (No party claims on appeal that any mistake was made in this case as to what claims were submitted to the jury and what claims were decided by the trial judge, so there is no need for further discussion of the differences here.)

The jury made several findings as to certain claims and factual issues—some in favor of the Hammondses and some in favor of the Barabans. The jury found that an easement had been established for the benefit of the Hammondses' property and that the placement of their house didn't constitute a trespass against the Barabans. But the jury didn't find that there was an agreement between the Hammondses and the Piccirillos to alter the boundary line between the two lots. The jury found in favor of the Hammondses on the Barabans' claims of fraud and fraud by silence. The jury awarded the Barabans $2,500 in damages for trespass based on the temporary presence of a berm of dirt that Glenn Hammonds had placed onto Lot 52. The jury also found that in addition to the trespass damages, the Barabans were entitled to punitive damages (which may be assessed to punish intentional wrongful conduct), and the district court awarded $500 to the Barabans in punitive damages.

After trial, the Barabans filed a motion asking either for judgment as a matter of law in favor of the Barabans or for a new trial. In March 2011, the district court denied the Barabans' motion. In April 2011, the district court issued its decision on the issues tried to the court. The court ordered that the deeds to the two lots should be reformed to reflect that the portion of Lot 52 containing the Hammondses' house is owned by the Hammondses rather than by the owners of Lot 52, the Barabans. The district court also ruled

that the easement was valid, so the owners of Lot 52 cannot build structures within the easement area.

The Barabans have appealed to this court. They claim that the district court erred in enforcing the claimed settlement agreement with the Piccirillos. They also claim that the district court erred in granting ownership of the disputed portion of Lot 52 to the Hammondses.

## I. *The District Court Erred in Enforcing a Purported Settlement Agreement Because Testimony About Oral Statements Made During Mediation Should Not Have Been Admitted.*

The first issue on appeal is between the Piccirillos and the Barabans. The Piccirillos filed a motion in the district court to enforce an oral settlement that the Piccirillos claimed had been reached between them and the Barabans. The district court granted that motion, thus ending the lawsuit between the Piccirillos and the Barabans with an enforced settlement agreement.

Before ruling, the district court heard testimony from the mediator, a retired judge; from the attorney who had represented the Barabans at the mediation; and from Manual Baraban. The Barabans objected to the mediator's testimony, citing the confidentiality of communications made during mediation under K.S.A. 2012 Supp. 60-452a, but the district court overruled that objection and allowed testimony about whether the parties agreed to a settlement and, if so, what the terms of that settlement were.

On appeal, the Barabans raise several objections to enforcement of the settlement, including a claim that Lois Baraban, who didn't attend the mediation, can't be bound by anything that was agreed to by the others and a claim that—contrary to the district court's factual findings—no final agreement was reached at the mediation. But we must start by determining whether the mediator should even have been allowed to testify regarding an alleged oral agreement made during mediation. Because K.S.A. 2012 Supp. 60-452a gives any party to mediation "a privilege . . . to prevent a witness from disclosing[] any communication made in the course" of the mediation and the Barabans exercised that privilege, the district court should not have allowed the mediator to testify about oral

statements made in mediation that he interpreted to be a settlement agreement. And without that evidence, there was no basis upon which to enforce a settlement, even assuming that one had been orally agreed upon during mediation.

There are competing policy considerations in play here, and the Kansas Legislature has balanced them by statute. On one hand, we want to encourage mediation of disputes, which can be done by offering strict confidentiality about what has been said during a mediation session. On the other hand, we also want to encourage settlement of disputes, which can be achieved by enforcing settlements once they are agreed to. The legislature has provided for strict confidentiality regarding oral communications made during mediation. This is outlined not only in K.S.A. 2012 Supp. 60-452a, a provision in the Kansas Rules of Evidence, but also by a provision in the Kansas Dispute Resolution Act, K.S.A. 2012 Supp. 5-512(a), which provides that "[a]ll verbal or written information transmitted between any party to a dispute and a neutral person conducting a proceeding under the dispute resolution act or the staff of an approved [dispute-resolution] program shall be confidential communications." That statute adds that "[n]o admission, representation or statement made in the proceeding shall be admissible as evidence . . . ." K.S.A. 2012 Supp. 5-512(a). The Dispute Resolution Act applies to mediations conducted by court referral or conducted by a program registered with and approved by the state's Director of Dispute Resolution. See Att'y Gen. Op. No. 2010-09. Taken together, K.S.A. 2012 Supp. 60-452a and K.S.A. 2012 Supp. 5-512(a) establish a strong rule that communications made during mediation are confidential and may not be admitted as evidence over a party's objection. See *In re Roth*, 269 Kan. 399, 408, 7 P.3d 241 (2000) (noting that right under K.S.A. 60-452a to keep mediation communications confidential is waived if no objection is made).

K.S.A. 2012 Supp. 60-452a(b) and K.S.A. 2012 Supp. 5-512(b) both provide for several exceptions to the confidentiality rule—allowing, for example, the disclosure of information necessary to stop the commission of an ongoing crime or fraud. See K.S.A. 2012

Supp. 60-452a(b)(3); K.S.A. 2012 Supp. 5-512(b)(3). But none of the exceptions apply here.

How strictly to enforce confidentiality regarding statements made in mediation—and what exceptions are to be applied—is a policy choice answered in Kansas and in other jurisdictions by legislation or court rule. Indiana has a similar provision to that of Kansas; the Indiana Rules for Alternative Dispute Resolution, adopted as court rules by the Indiana Supreme Court, provide for complete confidentiality of communications made in mediation: "Mediators shall not be subject to process requiring the disclosure of any matter discussed during the mediation, but rather, such matter shall be considered confidential and privileged in nature." Ind. R. for Alternative Dispute Resolution 2.11. Under that rule, the Indiana Supreme Court has held that a mediator's testimony as evidence of an oral mediation settlement agreement is inadmissible. *Vernon v. Acton*, 732 N.E.2d 805, 808-10 (Ind. 2000).

Some jurisdictions have created express exceptions that allow a mediator to testify during attempts to enforce disputed agreements. See Comment, Riner v. Newbraugh: *The Role of Mediator Testimony in the Enforcement of Mediated Agreements*, 107 W. Va. L. Rev. 329, 337, 344 nn.99-100 (2004) (citing statutes from Louisiana, Ohio, Wisconsin, Kentucky, Connecticut, Iowa, and Wyoming). But most jurisdictions don't have such an exception, 107 W. Va. L. Rev. at 340, and Kansas does not, either. So while the Kansas statutes at issue here have several specific exceptions to the confidentiality rule, they do not contain an exception allowing a mediator to testify about an alleged oral settlement.

We ordinarily presume that when the legislature expressly includes several listed exceptions to a statutory rule, it intends to exclude other exceptions. See *United States v. Johnson*, 529 U.S. 53, 58, 120 S. Ct. 1114, 146 L. Ed. 2d 39 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."); *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 458, 691 P.2d 1303 (1984) ("Where a statute specifies only certain exceptions to the general

application of the statute, then other exceptions are excluded."). Since the Kansas Legislature included several specific exceptions to confidentiality in our mediation statute—but no exception allowing the mediator to testify about the terms of a claimed settlement agreement—we conclude that there is no exception applicable to the situation at hand. We therefore apply the overall, general rule requiring confidentiality.

Our reading of K.S.A. 2012 Supp. 60-452a is reinforced by the fact that the legislature has not left the problem of getting an enforceable settlement out of mediation without a solution. Instead, the legislature has explicitly provided a way for parties to obtain a settlement that can be presented in court—put the agreement in writing. K.S.A. 5-514 specifically provides that a written mediation agreement signed by the parties in a court-referred case may be presented to the court for approval:

"If the parties involved in the dispute reach an agreement, the agreement may be reduced to writing and signed by the parties. The agreement shall set forth the settlement of the issues and the future responsibilities of each party. If a court referred the case, the agreement as signed and approved by the parties may be presented to the court as a stipulation and, if approved by the court, such agreement shall be enforceable as an order of the court."

Documenting a settlement agreement reached at mediation, either with a brief recitation in a recorded court session or in a brief writing, is an important and recommended practice when concluding a mediation session. See Denlow, *Concluding a Successful Settlement Conference: It Ain't Over Till It's Over*, 39 Ct. Rev. 14, 16-19 (Fall 2002) (providing a form checklist and term sheet that can be used to document a mediated settlement) (available at http://goo.gl/aLywn3). A brief writing containing the essential terms of the settlement and signed by the parties would be admissible—and enforceable. See K.S.A. 5-514.

Aside from the mediator's testimony, there is one additional piece of evidence of a settlement in the court file—an admission made by the Barabans' attorney. After the mediation, he filed a motion seeking an order that the Hammondses "cease trespassing" on Lot 52. In that motion, he alleged that "[a]t [the] mediation, an agreement was reached between the Barabans and the Piccirillos,"

an agreement that he said was "currently pending." He later testified that he only meant to confirm that there was an apparent settlement agreement pending before the court that the Barabans still had to agree to. But even if his statement were to be considered a judicial admission that some settlement had been reached, there is no way to determine the terms of the settlement from the evidence presented to the district court without considering the mediator's testimony about what was said during mediation.

In sum, the testimony from the mediator about what was said during the mediation session should not have been permitted. We have carefully reviewed the evidence presented to the district court on the Piccirillos' motion to enforce the settlement agreement. Once testimony from the mediator about what was said during the mediation session is excluded, the remaining evidence isn't sufficient to establish what the terms of any settlement may have been—something that must be established if the settlement is to be enforced. We therefore reverse the district court's order granting enforcement of that settlement.

II. *The District Court Did Not Err When It Ordered Reformation of the Deed Between the Hammondses and the Piccirillos.*

The second issue on appeal is between the Hammondses and the Barabans. The district court ruled in favor of the Hammondses on the quiet-title action, concluding that the area of Lot 52 on which the Hammondses' house sits now properly belongs to the Hammondses and that it's protected by a 15-foot easement that prevents other structures from being constructed on the north 15 feet of Lot 52. The Barabans appeal, contending that the district court should have held that Lot 52 in its entirety belongs to them, that no easement can be enforced against the Barabans, and that the portion of the Hammondses' house that sits on Lot 52 must be removed.

On appeal, we must accept the district court's factual findings if they are supported by substantial evidence; we then determine whether the findings supported by substantial evidence are sufficient to support the district court's ultimate legal conclusions regarding title to the land in dispute. See *U.S.D. No. 233 v. Kansas*

*Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003); *Mary A. Baska Revocable Trust v. Hoehn Park Homes Ass'n, Inc.*, No. 107,827, 2012 WL 6634436, at \*3 (Kan. App. 2012) (unpublished opinion).

There are two key aspects to the district court's ruling.

First, the court concluded that the Piccirillos and the Hammondses reached a specific agreement that the property boundary to Lot 52 would be altered to match the cut-out where the Hammondses' house sits on the original outline of Lot 52. Our Supreme Court has long upheld the right of parties to fix a property boundary line by agreement: "Where parties by mutual agreement fix a boundary line between their properties, acquiesce in the line so fixed and thereafter occupy their properties according to the line agreed upon, it must be considered as the true boundary line between them and will be binding upon the parties and their grantees." *Mahlandt v. Jabes*, 232 Kan. 435, Syl. ¶ 3, 658 P.2d 356 (1983); accord *Moore v. Bayless*, 215 Kan. 297, Syl. ¶ 1, 524 P.2d 721 (1974); *Kyte v. Chessmore*, 106 Kan. 394, 398, 188 P. 251 (1920). To uphold the district court's ruling, then, there must be substantial evidence in the record to support its conclusion that the Piccirillos and Hammondses made this agreement about the property boundary.

Second, the district court concluded that the Barabans had constructive notice that the Hammondses' house overlapped the recorded boundary line for Lot 52. Specifically, the district court said that several facts were sufficient to "cause a reasonable person to inquire as to the boundary" given the location of the Hammondses' house. This is an important point because the rights of innocent third parties can prevent the reformation (or court revision) of a deed to conform to a boundary-line agreement made by other parties. This type of buyer is known as a bona fide purchaser, meaning he or she has made the purchase without notice of a mistake in the title. Thus, if the Barabans had no notice—actual or constructive—of the boundary agreement between the Piccirillos and the Hammondses and the deed to Lot 52 gave the Barabans title to the cut-out section with the house on it (as the deed in fact did), then the Barabans would have proper legal title to all of Lot 52. See *Beams*

*v. Werth*, 200 Kan. 532, 544, 438 P.2d 957 (1968) (noting that right to have deed reformed "is subject to being cut off by a bona fide purchaser—a subsequent purchaser for value and without notice of the mistake").

To determine what evidence must be in our record to uphold the district court's ruling on this second point, we need to also explain the concept of constructive notice. Even if the Barabans had no actual notice that Lot 52 no longer included the cut-out area, constructive notice would be enough to take them out of the category of "bona fide purchaser without notice," and, thus, they could not prevent reformation of the deed to reflect a boundary agreement between the Hammondses and the Piccirillos.

Under constructive-notice concepts, if the buyer has knowledge of facts that a prudent person would investigate further—and if that investigation would disclose the key facts at issue (here, that the Hammondses' house partially sat on Lot 52)—then the buyer isn't a bona fide purchaser without notice:

" '[I]t is a general rule that knowledge of such facts as ought to put a prudent man on inquiry as to the title charges a subsequent purchaser with notice not only of those facts which are actually known, but also of all the other facts which a reasonably diligent investigation would have ascertained, provided the inquiry becomes a duty, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding.' " *Federal Savings & Loan Ins. Corp. v. Urschel*, 159 Kan. 674, 681, 157 P.2d 805 (1945).

For constructive-notice purposes, having knowledge of circumstances sufficient to arouse the suspicions of a prudent person and to put him or her on inquiry is the same as having the factual knowing that a diligent inquiry would have disclosed. *City of Arkansas City v. Anderson*, 15 Kan. App. 2d 174, 181, 804 P.2d 1026, *rev. denied* 248 Kan. 994 (1991).

So we turn now to determine whether there is sufficient evidence to support the district court's conclusions on these two points—first, that the Piccirillos and the Hammondses reached a boundary-line agreement, and second, that the Barabans had constructive notice that the house extended onto Lot 52.

*Agreement Between the Piccirillos and the Hammondses*

In its written decision, the district court said that "the evidence established that the Hammonds conveyed a portion of Lot 52 to Benjamin and Linda Piccirillo (the Piccirillos), carving out the portion of Lot 52 on which the Hammonds house rested." The court cited the written easement agreement, which was signed by Glenn Hammonds and Benjamin Piccirillo, as well as "the evidence" generally. In its earlier decision denying the motion for a new trial, the court had also cited "testimony from both Mr. Hammonds and Mr. Piccirillo[] that Mr. Hammonds sold Mr. Piccirillo Lot 52, minus the portion of Lot 52 on which the Hammonds house rests."

Substantial evidence supports the district court's conclusion that the Hammondses intended not to sell the cut-out portion on which the house sat and that the Piccirillos agreed to buy Lot 52 minus that cut-out. Glenn Hammonds testified that he "was intending to sell Mr. Piccirillo Lot 52 except for the part that the house sat on." Similarly, in a videotaped deposition presented at trial, Hammonds said that the boundary was changed before the sale of Lot 52 to the Piccirillos.

Although Benjamin Piccirillo arguably gave some inconsistent testimony on this point, he ultimately provided testimony that aligns with Glenn Hammonds' testimony and supports the district court's conclusion. Initially, Piccirillo said that he had intended to buy all of Lot 52. But on cross-examination, he clarified that he "bought what was supposed to be—what Lot 52 was supposed to be." In response to a direct question from the trial judge, Piccirillo said, "What I thought I was buying was the part that was altered to make accommodations for that house." At another point, Piccirillo testified that a yellow line on an exhibit presented to the court "was [drawn] to show what the setback was supposed to be at that—that area taken out of Lot 52 to accommodate the house . . . ." When asked whether he bought "that portion of land with Lot 52," Piccirillo replied, "No, I didn't. I was thinking that I didn't."

This evidence was sufficient to support the district court's factual finding that the Hammondses and the Piccirillos reached an agree-

ment to change the boundary line of Lot 52 so that it didn't include the cut-out on which the house sat.

The Barabans have raised several other challenges to the legality of the boundary-line agreement between the Hammondses and the Piccirillos. As the district court ruled, however, the Barabans are not a proper party to raise these claims:

- The Barabans argue that the boundary agreement wasn't valid because neither Glenn Hammonds' wife nor Benjamin Piccirillo's wife signed it. We agree with the district court that a third party can't assert the rights of Vanilda Hammonds and Linda Piccirillo, see *Haas v. Nemeth*, 139 Kan. 252, 255, 31 P.2d 6 (1934), and neither of the wives has objected to the boundary agreement.

- The Barabans raise other objections to the validity of the boundary agreement, including that it violated the statute of frauds, but they don't have standing to raise those objections because they weren't a party to the agreement. Nor does the statute of frauds apply to a contract fully carried out by the parties, which is what the district court found had happened here. See *Haas*, 139 Kan. at 254.

- The Barabans claim that the sale to the Piccirillos should be void because it violated city ordinances. In a nutshell, the Barabans claim that city zoning rules didn't allow a house to be built on Lot 52, with the cut-out and given the overlapping location of the existing house. But the district court properly noted that the sale was for an undeveloped lot, and the undeveloped lot didn't violate any city ordinances. There is a process for obtaining variances from zoning restrictions, and Piccirillo apparently used that process before building the house on Lot 52. Moreover, the Barabans once again lack standing—here, the standing to assert the violation of city zoning rules that are enforced by city officials, not the Barabans.

- The Barabans also assert that the district court improperly reversed its initial default judgment granted with respect to the Barabans' nuisance claims; one factual allegation had

been that the Hammondses' house encroached on Lot 52, and the Hammondses, who represented themselves, had failed to file an answer. So the court entered judgment in favor of the Barabans on that issue. The Barabans claim that the district court's subsequent decision about the boundary line was unfair, but they cite no legal authority questioning the district court's authority not to grant a default judgment in this circumstance.

We have examined the various technical objections raised by the Barabans in their brief, but we find none of merit.

Before leaving the topic of the boundary-line agreement, we note briefly that the jury answered "no" to a specific question about whether "the Hammonds and [the] Piccirillos agreed to alter the boundary or property line." We should perhaps explain why that jury finding does not control our result here. First, the quiet-title action was tried to the court, not the jury, and that hasn't been challenged in any way on appeal. Second, the Barabans have made no argument on appeal that the district court was bound by the jury's finding on this point. The Barabans merely note in their appellate brief that "[t]he jury found there was no 'boundary agreement.' " But that statement was in a section that argued there was no boundary agreement because Linda Piccirillo and Vanilda Hammonds hadn't specifically been part of any agreement—a legal argument we've already rejected—not in support of any other argument.

We should also note that the district court's jury instruction on what was required to prove a boundary-line agreement included a requirement that the jury find that "[t]he true boundary line was disputed or uncertain." That requirement, apparently based on a jury instruction suggested by the Barabans, is an odd one even to contemplate in the context of this case. Our case arose in the context of a boundary agreement made in connection with *the sale of* property, and the parties could agree upon *any* boundary they chose to apply to what was bought and sold between them. This was not a case that arose between parties who already owned neighboring lots. In such a case, one might apply a requirement that

there first have been some dispute before overriding the written record of the transaction. See *Stith v. Williams*, 227 Kan. 32, 34-35, 605 P.2d 86 (1980) (discussing the boundary-line agreement rule in the context of a disputed strip of land between neighboring property owners). But the general rule in Kansas has no requirement of a preexisting dispute, instead requiring only two elements: where parties (1) agree to fix a boundary line and (2) then acquiesce to follow the agreed-upon line, it is considered the true boundary line. *E.g., Moore*, 215 Kan. 297, Syl. ¶ 1; *Beams*, 200 Kan. 532, Syl. ¶ 7; *In re Moore*, 173 Kan. 820, Syl. ¶¶ 2-3, 252 P.2d 875 (1953); *Kyte*, 106 Kan. at 398. This rule—with no reference to the need for a preexisting dispute about the boundary—has been specifically applied where parties to the sale of property had agreed upon the boundary line. *Blanford v. Biven*, 123 Kan. 269, 254 P. 1030 (1927); *McBeth v. White*, 122 Kan. 637, 253 P. 212 (1927).

*Constructive Notice That the House Extended onto Lot 52*

The closest question in this appeal is whether the Barabans had constructive notice that the Hammondses' house extended onto Lot 52. We will therefore set out the district court's ruling in detail before we proceed to discuss the evidence that supports its conclusions.

In ordering reformation of the deed, the district court found that the Barabans weren't bona fide purchasers because the location of the Hammondses' house "provided the Barabans with notice of some irregularity in the boundary to Lot 52." In its earlier order denying the Barabans' motion for judgment as a matter of law, the district court gave several reasons for its conclusion that the Barabans weren't bona fide purchasers. Those reasons included the location of the house and the Barabans' ability to discover its positioning with respect to the boundary line through a survey or a careful physical inspection:

"In the instant case, the Hammonds' rental house rested, in part, on Lot 52. Before closing, Mr. Baraban's title insurance company conducted a survey (dated April 28, 2005) which noted Lot 52 as only 90 feet wide, cutting off the entire portion of the lot (not just a cut-out) encroached upon by the Hammonds' house. (Def. Exh. 200) These facts indicate that a physical inspection of the property or survey would have imparted notice of a boundary issue. Similarly, the Barabans

obtained an appraisal which notes the presence of the Hammonds' house and estimates the impact of the house on Lot 52's value. Clearly, such appraisal information could have been obtained prior to the purchase of [the] real estate. Based on these facts, the Court finds that the Barabans had such notice as would cause a reasonable person to inquire as to the boundary and/or any other unrecorded property rights. The Hammonds' house stood on the lot the Barabans were purchasing just as clearly as a freight train on the tracks at an unlit crossing."

The district court's allusion to a freight train on the tracks overstates the case a bit; its reference to the survey and appraisal information may too. Manual Baraban testified that he didn't receive the title insurance company's survey until 2007 when this lawsuit was filed. And Baraban obtained the appraisal in 2008. To be clear, Baraban had neither of these documents when he bought the property in 2005, though the district court is asserting that a prudent person would have inquired about the boundary sooner and could have obtained the information at the time of sale.

There was also some other evidence that supports the Barabans' position that they wouldn't have realized that the house encroached onto Lot 52. Benjamin Piccirillo testified that he told Manual Baraban that the Hammondses' house didn't encroach on the property; although that was based on Piccirillo's understanding that the Hammondses still owned the portion of the land containing the house, Piccirillo didn't communicate that to Baraban. Baraban testified that he didn't discuss the house or how it was positioned with Piccirillo before he bought the property. Baraban testified that he checked that the property he intended to buy matched the deed, and he said that he relied on the deed to be accurate. He also testified that he assumed the title company would notify him if there was a problem and that he didn't receive its survey until he asked for it 2 years later. Baraban said that no survey stakes or survey markers were visible when he looked at the house before buying it.

But there is also evidence that supports the district court's conclusion. Baraban volunteered that his employee, Wes Campbell, who rented the Baraban house, suspected there was a boundary issue based upon that employee's own observations. Baraban testified, "Wes did some measuring, and he's pretty well-versed in

finding property and stuff. He measured over, and he began to realize that [the Hammondses] were encroaching on our property." That discovery led Baraban to notify Glenn Hammonds of the problem by letter in 2006. Campbell testified that the boundary issue came to light after Hammonds removed some bushes from Campbell's backyard. Campbell testified, "[I]t was our understanding that was on our property, not his. . . . [H]e said they were on his property and that's why he took them out."

We should also note that had Baraban obtained a survey, it would have shown the problem. Baraban commissioned another survey in 2008, which showed that the Hammondses' house extended into Lot 52.

As we have already suggested, whether the positioning of the house put the Barabans on notice that there may have been a mistake in the deed is a close call. On one hand, Baraban testified that he checked the public record to verify that the deed matched the property he believed he was buying. And the boundary line wasn't marked or visible. While a survey and an appraisal at the time of sale would have raised red flags, it isn't clear whether paying for such services should be considered required components of a reasonably diligent investigation. See, *e.g.*, *Bennett v. Evans*, 161 Neb. 807, Syl. ¶ 2, 74 N.W.2d 728 (1956) (holding that an encroaching garage wasn't open, visible, and apparent if an actual survey was required to discover the encroachment); *Tibby v. Fletcher*, 13 A.D. 3d 877, 879, 788 N.Y.S.2d 430 (2004) (finding that buyers weren't bona fide purchasers in part because they didn't commission a survey or appraisal before buying the property). On the other hand, the renter's own suspicions led to the discovery of the boundary issue through a simple measurement. Notably, this discovery was made before Baraban obtained the title company's survey or the appraisal cited by the district court. In other words, a reasonably diligent investigation actually did lead to the knowledge of a boundary issue in this case.

The district court is the fact-finder for determining title to the land. There is sufficient evidence to support its conclusion that the position of the Hammondses' house was close enough in proximity to the property line to at least trigger a reasonably diligent inves-

tigation. As Campbell's rough measurements showed—and a survey confirmed—a reasonably diligent investigation would have revealed the problem. So there is sufficient evidence to support the district court's conclusion that the Barabans had constructive notice of a potential boundary issue. As a result, the Barabans weren't bona fide purchasers, so they can't prevent reformation of the deed. We therefore affirm the district court's judgment reforming the deed.

The district court's judgment enforcing the settlement agreement between the Piccirillos and the Barabans is reversed, and the claims between those parties are remanded to the district court for further proceedings.

The district court's judgment between the Hammondses and the Barabans is affirmed.